# IN THE SUPREME COURT OF CALIFORNIA

PITZER COLLEGE,
Plaintiff and Appellant,

v.

INDIAN HARBOR INSURANCE COMPANY,
Defendant and Respondent.

S239510

Ninth Circuit
14-56017

Central District of California
2:13-cv-05863-GW-E

_____

August 29, 2019

Justice Chin authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Cuéllar, Kruger, and Groban concurred.

_____

# PITZER COLLEGE v. INDIAN HARBOR INSURANCE COMPANY

## S239510

Opinion of the Court by Chin, J.

California's notice-prejudice rule generally allows insureds to proceed with their insurance policy claims even if they give their insurer late notice of a claim, provided that the late notice does not substantially prejudice the insurer. (*Campbell v. Allstate Ins. Co.* (1963) 60 Cal.2d 303, 307 (*Campbell*).) In this context, we consider two narrow questions from the United States Court of Appeals for the Ninth Circuit, restated as follows: (1) Is California's common law notice-prejudice rule a fundamental public policy for the purpose of choice of law analysis? (2) If so, does the notice-prejudice rule apply to the consent provision of the insurance policy in this case? (Cal. Rules of Court, rule 8.548(f)(5) [Supreme Court may restate questions or ask the requesting court for clarification].) In line with California's strong preference to avoid technical forfeitures of insurance policy coverage, we conclude (1) that our notice-prejudice rule is a fundamental public policy of our state in the insurance context, and (2) the rule generally applies to consent provisions in the context of first party liability policy coverage and not to consent provisions in third party liability policies. We leave it for the Ninth Circuit to decide whether the consent provision at issue here contemplates first party or third party coverage.

1

## I. FACTS AND PROCEDURAL HISTORY

The Claremont University Consortium (CUC) is an umbrella entity that enters into insurance contracts on behalf of the Claremont Colleges, including plaintiff Pitzer College (Pitzer). (*Pitzer College v. Indian Harbor Ins. Co.* (9th Cir. 2017) 845 F.3d 993, 994 (*Pitzer College*).) The CUC purchased an insurance policy (Policy) from defendant Indian Harbor Insurance Company (Indian Harbor) that covered Pitzer for legal and remediation expenses resulting from pollution conditions discovered during the policy period of July 23, 2010 to July 23, 2011. (*Ibid.*)

The Policy contains three provisions pertinent to our review. First, a *notice provision* requires Pitzer to provide oral or written notice of any pollution condition to Indian Harbor and, in the event of oral notice, to "furnish . . . a written report as soon as practicable."[1] Second, a *consent provision* requires Pitzer to obtain Indian Harbor's written consent before incurring expenses, making payments, assuming obligations, and/or commencing remediation due to a pollution condition.[2]

---

[1] The notice provision states in relevant part: "As a condition precedent to the coverage hereunder, in the event . . . any POLLUTION CONDITION is first discovered by the INSURED that results in a LOSS or REMEDIATION EXPENSE [¶] . . . [¶] The INSURED shall provide to the Company, whether orally or in writing, notice of the particulars with respect to the time, place and circumstances thereof, along with the names and addresses of the injured and of available witnesses. In the event of oral notice, the INSURED agrees to furnish to the Company a written report as soon as practicable."

[2] The consent provision states in relevant part: "No costs, charges, or expenses shall be incurred, nor payments made,

Pursuant to an *emergency exception* to this consent provision, however, if Pitzer incurs costs "on an emergency basis where any delay . . . would cause injury to persons or damage to property or increase significantly the cost of responding to any [pollution condition]," then Pitzer is *not* required to obtain Indian Harbor's prior written consent, but it *is* required to notify Indian Harbor "immediately thereafter."  Third, a *choice of law provision* states that New York law governs all matters arising under the Policy.[3]

On January 10, 2011, Pitzer discovered darkened soils at the construction site for a new dormitory on campus.  (*Pitzer College*, *supra*, 845 F.3d at p. 994.)  "By January 21, 2011, Pitzer determined that remediation would be required."  (*Ibid.*)  With pressure to complete the dormitory prior to the start of the 2012-2013 academic year, Pitzer conferred with environmental consultants who determined that the least expensive and most expeditious option was to conduct lead removal onsite using a transportable treatment unit (TTU).  Pitzer reserved one of the two TTUs that were licensed for use in Southern California and began the treatment process.  (*Ibid.*)  Remediation work

obligations assumed or remediation commenced without the Company's written consent which shall not be unreasonably withheld.  This provision does not apply to costs incurred by the INSURED on an emergency basis, where any delay on the part of the INSURED would cause injury to persons or damage to property or increase significantly the cost of responding to any POLLUTION CONDITION.  If such emergency occurs, the INSURED shall notify the Company immediately thereafter."

[3]     The choice of law provision states:  "All matters arising hereunder including questions related to validity interpretation, performance and enforcement of this Policy shall be determined in accordance with the law and practice of the State of New York (notwithstanding New York's conflicts of law rules)."

commenced on March 9, 2011 with the setup of the TTU and was successfully completed one month later at a total cost of nearly $2 million. Indian Harbor's expert later opined that the remediation could have been performed at a reduced cost using alternative methods, and that the manner of remediation waived subrogation rights against others who may have been responsible for the contaminated soil.

Pitzer did not obtain Indian Harbor's consent before commencing remediation or paying remediation costs. (*Pitzer College, supra,* 845 F.3d at p. 995.) In fact, "Pitzer did not inform Indian Harbor of the remediation until July 11, 2011, approximately three months after it completed remediation and six months after it discovered the darkened soils." (*Ibid.*)

"On August 10, 2011, Indian Harbor acknowledged receipt of Pitzer's notice of remediation." (*Pitzer College, supra,* 845 F.3d at p. 995.) On March 16, 2012, Indian Harbor denied coverage based on Pitzer's failure to give notice as soon as practicable and its failure to obtain Indian Harbor's consent before commencing the remediation process. (*Ibid.*)

Pitzer sued Indian Harbor in Los Angeles County Superior Court for declaratory relief and breach of contract. (*Pitzer College*, *supra*, 845 F.3d at p. 995.) Indian Harbor removed the case to federal court on the basis of diversity jurisdiction and moved for summary judgment, claiming that it had no obligation to indemnify Pitzer for remediation costs because Pitzer had violated the Policy's notice and consent provisions. The district court granted the motion. (*Ibid.*)

The district court held that New York law applied, because although a state's fundamental policy can override a choice of law provision, Pitzer had "failed to establish" that California's

notice-prejudice rule is such a policy. (*Pitzer College, supra,* 845 F.3d at p. 995; see *Indian Harbor Ins. Co. v. City of San Diego* (S.D.N.Y. 2013) 972 F.Supp.2d 634, 648-653.) Although section 3420, subdivision (a)(5) of New York Insurance Law applies a notice-prejudice rule to insurance policies issued or delivered *in* New York, policies issued and delivered *outside* New York [as in this case] are subject to a strict no-prejudice rule under New York common law, which denies coverage where timely notice is not provided. Applying New York law pursuant to the Policy's choice of law provision, the court concluded that summary judgment was warranted because Pitzer did not provide timely notice, as required by the Policy's notice provision. (*Pitzer College, supra,* 845 F.3d at p. 995.) The district court did note, however, that Indian Harbor would not have prevailed at summary judgment on this ground if it had been required to show prejudice. (*Ibid.*)

Additionally, the district court held that summary judgment was separately warranted because Pitzer did not comply with the Policy's consent provision. (*Pitzer College, supra,* 845 F.3d at p. 995.) Here, the court rejected Pitzer's argument that its remediation costs were incurred on an emergency basis, and therefore it had not been required to obtain prior written consent pursuant to the emergency exception to the consent provision. (*Ibid.*) Even if the emergency exception did apply, the court explained, Pitzer had failed to notify Indian Harbor "immediately" after it incurred its costs. (*Ibid.*) It is unclear whether the district court addressed Pitzer's arguments (1) that the notice-prejudice rule should apply to the consent provision as well as the notice provision, and (2) that the State of California has "a materially greater

interest" in the determination of the issue than the State of New York for choice of law purposes.

Pitzer timely appealed, and oral arguments were heard before the Ninth Circuit Court of Appeals. In issuing the certified questions to us, the Ninth Circuit observed: "Resolution of this appeal turns on whether California's notice-prejudice rule is a fundamental public policy for the purpose of choice-of-law analysis. If the California Supreme Court determines that the notice-prejudice rule is fundamental, the appeal then turns on whether, in a first party policy like Pitzer's, a consent provision operates as a notice requirement subject to the notice-prejudice rule. No controlling California precedent answers either question. *See* Cal. R. Ct. 8.548(a). Because the district court determined that '[i]f prejudice is required, [Indian Harbor] would not be able to prevail at summary judgment,' these questions are dispositive." (*Pitzer College, supra,* 845 F.3d at p. 995.)

## II. DISCUSSION

### A. Choice of Law Analysis

The crux of this case lies in the choice of law provision, designating that New York law should govern all matters arising under the Policy. California applies the principles set forth in section 187 of the Restatement Second of Conflict of Laws (section 187) in determining the enforceability of contractual choice of law provisions. (*Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 464-466 (*Nedlloyd*), citing § 187, subd. (2).) Under section 187, the parties' choice of law generally governs unless (1) it conflicts with a state's fundamental public policy, and (2) that state has a materially greater interest in the determination of the issue than the

contractually chosen state. (*Nedlloyd, supra,* 3 Cal.4th at pp. 465-466.) In *Nedlloyd,* we articulated California's multi-step choice of law analysis: "[T]he proper approach under Restatement section 187, subdivision (2) is for the court first to determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law. [Fn. omitted.] If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California. [Fn. omitted.] If there is no such conflict, the court shall enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a 'materially greater interest than the chosen state in the determination of the particular issue. . . .' (Rest., § 187, subd. (2).) If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy." (*Nedlloyd, supra,* at p. 466.) Thus, if the party opposing the application of the choice of law provision—here, Pitzer—can establish "both that the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in the determination of the particular issue," then the court will not enforce the provision. (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 917.)

Regarding the first step of *Nedlloyd*'s choice of law analysis, the parties agree with the district court's finding that there is at least a "reasonable basis" for the selection of New

York law. (*Nedlloyd, supra,* 3 Cal.4th at p. 466.) Our initial task, therefore, is to decide the first part of *Nedlloyd's* second step and determine whether California's notice-prejudice rule is a fundamental public policy.

### B. California's Notice-prejudice Rule

California's notice-prejudice rule requires an insurer to prove that the insured's late notice of a claim has substantially prejudiced its ability to investigate and negotiate payment for the insured's claim. A finding of substantial prejudice will generally excuse the insurer from its contractual obligations under the insurance policy, unless the insurer had actual or constructive knowledge of the claim. (See *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 760-763 (*Shell Oil*); *Campbell, supra,* 60 Cal.2d 303.) As the Court of Appeal observed in *Shell Oil*, "California law is settled that a defense based on an insured's failure to give timely notice requires the insurer to prove that it suffered substantial prejudice. (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d [865,] 881-883; *Billington v. Interinsurance Exchange* (1969) 71 Cal.2d 728, 737-738; [citations].) Prejudice is not presumed from delayed notice alone. [Citations.] The insurer must show actual prejudice, not the mere possibility of prejudice. [Citation]." (*Shell Oil*, at pp. 760-761.)

Although no case has referred to California's notice-prejudice rule as a fundamental rule of public policy, we have called the rule "the public policy of this state," favoring compensation of insureds over technical forfeiture. (*Campbell, supra,* 60 Cal.2d at p. 307; see *UNUM Life Ins. Co. of America v. Ward* (1999) 526 U.S. 358, 372 [noting that California's policy of enforcing the notice-prejudice rule was key to its decision]; see also *UNUM, supra,* 526 U.S. at p. 372 [noting that California's

notice-prejudice rule is "grounded in policy concerns specific to the insurance industry"]; *Service Management Systems, Inc. v. Steadfast Ins. Co.* (9th Cir. 2007) 216 Fed. Appx. 662, 664 [noting the "strong public policy behind [California's] notice-prejudice rule"]; *Insurance Co. of State of Pennsylvania v. Associated Int'l Ins. Co.* (9th Cir. 1990) 922 F.2d 516, 524 [noting "California's strong public policy against 'technical forfeitures' " in context of notice provision]; *National Semiconductor Corp. v. Allendale Mut. Ins. Co.* (D.Conn. 1982) 549 F.Supp. 1195, 1200 [noting "strong and abiding policy" of California's notice-prejudice rule].)

As one California Court of Appeal has recognized, there are no "bright-line rules for determining what is and what is not contrary to a fundamental policy of California. Comment g to Restatement section 187 itself says that '[n]o detailed statement can be made of the situations where a "fundamental" policy . . . will be found to exist.' " (*Discover Bank v. Superior Court* (2005) 134 Cal.App.4th 886, 893-894.) Likewise, although *Nedlloyd* observes that a statute, constitution, or principle of contractual unconscionability *may* establish a fundamental policy, it states no requirement that a fundamental policy *must* be established by any one of these vehicles. (*Nedlloyd, supra,* 3 Cal.4th at p. 471.)

Initially, we note that the difference between a "strong" public policy and a "fundamental" one is essentially semantic when our goal is to protect those with inferior bargaining power in the insurance context. A policy such as the notice-prejudice rule may be considered fundamental because it is connected to concerns of fundamental fairness in the negotiation process. (See *Campbell, supra,* 60 Cal.2d at p. 307.)

We can look to other courts for guidance on how to determine whether a policy is fundamental in the absence of legislative mandate. (See *Prince George's County. v. Local Gov't Ins. Trust* (2005) 388 Md. 162, 183, fn. 9 [879 A.2d 81].) Courts in these jurisdictions have cited three essential reasons for adopting the notice-prejudice rule: "1) 'the adhesive nature of insurance contracts'; 2) 'the public policy objective of compensating tort victims'; and 3) 'the inequity of the insurer receiving a windfall due to a technicality.'" (*Century Sur. Co. v. Jim Hipner, LLC* (Wyo. 2016) 377 P.3d 784, 789.) These reasons are largely in accord with the justifications courts have set forth in determining that other rules constitute fundamental public policies. Namely, rules have been found to be fundamental public policies when (1) they cannot be contractually waived; (2) they protect against otherwise inequitable results; and (3) they promote the public interest.

The first reason for establishing the notice-prejudice rule as a fundamental policy of our state is that the notice-prejudice rule cannot be contractually waived and, thus, restricts freedom of contract. When it applies, the rule prevents enforcement of a contractual term. It overrides the parties' express intentions for a defined notice term, preventing a technical forfeiture of insurance benefits unless the insurer can show it was prejudiced by the insured's late notice.

Such restriction on parties' freedom of contract has led to the adoption of fundamental policies in other contexts, including the constitutional right to a jury trial (*Rincon EV Realty LLC v. CP III Rincon Towers, Inc.* (2017) 8 Cal.App.5th 1, 11-13); the statutory requirement that contractual attorney fees provisions be reciprocal (*ABF Capital Corp. v. Grove Properties Co.* (2005) 126 Cal.App.4th 204, 117); and the statutory ban on collecting a

postforeclosure balance from a borrower (*Guardian Savings & Loan Assn. v. MD Associates* (1998) 64 Cal.App.4th 309, 321). To this end, we have already pointed out that the notice-prejudice rule is designed to restrict freedom of contract because it is intended to prevent inequitable technical forfeitures that may otherwise result from the contract's terms. (See *Cisneros v. UNUM Life Ins. Co. of America* (9th Cir. 1998) 134 F.3d 939, 946.) As *Nedlloyd* observes, courts may consider application of a public policy that is designed to "restrict freedom of contract." (*Nedlloyd, supra,* 3 Cal.4th at p. 468.)

Second, the notice-prejudice rule protects insureds against inequitable results that are generated by insurers' superior bargaining power. We have consistently recognized that insurance contracts typically are "inherently unbalanced" and "adhesive," which "places the insurer in a superior bargaining position." (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 820; see *Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 404 ["A fundamental disparity exists between the insured, which performs its basic duty of paying the policy premium at the outset, and the insurer, which, depending on a number of factors, may or may not have to perform its basic duties of defense and indemnification under the policy"].)

Comment g to section 187 at page 568, also finds that policies "designed to protect a person against the oppressive use of superior bargaining power" may be considered fundamental and unwaivable. (See, e.g., *In re DirecTV Early Cancellation Litigation* (C.D.Cal. 2010) 738 F.Supp.2d 1062, 1087 ["California Civil Code § 1671(d) . . . reflects California's fundamental policy to protect consumers against the oppressive use of liquidated damages clauses by parties with superior bargaining power"].)

The third criterion for establishing a fundamental policy is also satisfied in this case: The notice-prejudice rule promotes objectives that are in the general public's interest because it protects the public from bearing the costs of harm that an insurance policy purports to cover. (*Campbell, supra,* 60 Cal.2d at p. 306.) Where California has an important interest at stake, there is no reason why that interest is any less valid or worthy of consideration because it was developed in court decisions and not by legislative action.

Indian Harbor's contrary argument that the notice-prejudice rule is not a fundamental policy is unpersuasive. Initially, it relies on *Gantt* for its contention that our declaration of a fundamental public policy must be "delineated in constitutional or statutory provisions" or a rule of unconscionability. (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1095.) In *Gantt*, the plaintiff sued his former employer, alleging he had been constructively discharged in retaliation for testifying truthfully about a coworker's sexual harassment claim. (*Id.* at pp. 1087-1089.) *Gantt* held that the employer violated a fundamental public policy that was grounded in Government Code section 12975, which prohibits obstruction of a Department of Fair Employment and Housing investigation. (*Gantt, supra,* 1 Cal.4th at pp. 1096-1097.)

Although *Gantt* emphasized that while "[t]he employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes" (*Gantt, supra,* 1 Cal.4th at p. 1095), we distinguish it from the case at hand because implicit in *Gantt* is the recognition that it would be unreasonable to expect employers to anticipate what fundamental public policies that courts might identify, on pain of liability in tort (*ibid.*). The fundamental

public policy we identify in the insurance context brings with it no potential for tort liability; on the contrary, it prevents a windfall redounding to the benefit of the insurer, the party with superior bargaining power.  Additionally, courts already decline to enforce contractual provisions that they consider to be contrary to state public interests.  (See *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.* (2018) 6 Cal.5th 59, 73 [concluding that a contract or transaction may be found contrary to public policy despite Legislature's silence on the issue].)

Amicus curiae in support of Pitzer, United Policyholders, notes that comment g to section 187 makes the same point.  Comment g observes that for a policy to be considered fundamental, it *must* be "substantial" and "*may* be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power."  (§ 187, com. g, p. 568, italics added.)

Application of the notice-prejudice rule as a fundamental public policy is also consistent with *Nedlloyd*'s holding that the implied covenant of good faith and fair dealing is not a fundamental policy of California.  (*Nedlloyd, supra,* 3 Cal.4th at p. 468.)  The implied covenant of good faith and fair dealing in employment contracts operates differently from the notice-prejudice rule in an insurance contract.  The implied covenant supplements, rather than overrides, an agreement with a promise to act in good faith in order to "carry out the presumed intentions of contracting parties."  (*Ibid*.)  The notice-prejudice rule, by contrast, overrides a contractual term, and is expressly "designed to restrict freedom of contract."  (*Ibid*.)

Based on the foregoing reasoning, we conclude that California's notice-prejudice rule is a fundamental public policy of California. The rule is based on the rationale that the essential part of the contract is insurance coverage, not the procedure for determining liability, and that " 'the notice requirement serves to protect insurers from prejudice, . . . not . . . to shield them from their contractual obligations' through " 'a technical escape-hatch.' " " (*Carrington Estate Planning Services v. Reliance Standard Life Ins. Co.* (9th Cir. 2002) 289 F.3d 644, 647.) Prejudice is a question of fact on which the insurer has the burden of proof. (*Campbell, supra,* 60 Cal.2d at p. 306.) The insured's delay does not itself satisfy the burden of proof. (See *Shell Oil, supra,* 12 Cal.App.4th at p. 761.) The insurer establishes actual and substantial prejudice by proving more than delayed or late notice. It must show " 'a substantial likelihood that, with timely notice, and notwithstanding a denial of coverage or reservation of rights, it would have settled the claim for less or taken steps that would have reduced or eliminated the insured's liability.' " (*Safeco Ins. Co. of America v. Parks* (2009) 170 Cal.App.4th 992, 1004.) In the context of third party coverage, for example, the insurer must show that timely notice would have enabled it to achieve a better result in the underlying third party action. (*Ibid.*)

Because our review is limited to answering the Ninth Circuit's first question in the affirmative, we leave it to that court to decide the remaining issues concerning whether California has a materially greater interest than New York in determining the coverage issue, such that the contract's choice of law would be unenforceable because it is contrary to our fundamental public policy. (*Washington Mutual Bank v. Superior Court, supra,* 24 Cal.4th at p. 917.) We now turn to the

Ninth Circuit's second question, as modified: whether California's notice-prejudice rule applies to the Policy's consent provision.

## C. Consent Provision and the Notice-prejudice Rule

We begin by reviewing the Policy's requirements. As discussed above, the consent provision here provides that, in the absence of an emergency, "[n]o costs, charges, or expenses shall be incurred without the Company's written consent, which shall not be unreasonably withheld." There is no dispute that Pitzer failed to obtain Indian Harbor's prior written consent and that Pitzer notified Indian Harbor after it had remediated the pollution damage.

As we explain below, such a consent requirement serves a role beyond the requirement to give prompt notice of a coverage event. But both promises are, nevertheless, ancillary to the insured's "basic duty of paying the policy premium" in exchange for the insurer's basic duties of defense, indemnification, or coverage for loss or remediation expenses. (*Kransco*, *supra*, 23 Cal.4th at p. 404.) As one court explained, "the purpose of a notice provision is to protect the interests of the insurer" in the performance of its basic duties — "for example, by affording the insurer the opportunity to acquire full information about the circumstances of the case, assess its rights and liabilities, and take early control of the proceedings." (*Prince George's County v. Local Government Ins. Trust* (Md. 2005) 879 A.2d 81, 95.) And so, "[i]f the insured violates the notice provision without harming the interests of the insurer — i.e. without prejudice — then there is no reason to deny coverage." (*Ibid.*; see also *Weaver Bros., Inc. v. Chappel* (Alaska 1984) 684 P.2d 123, 125 ["[T]he

notice requirement is designed to protect the insurer from prejudice. In the absence of prejudice, regardless of the reasons for the delayed notice, there is no justification for excusing the insurer from its obligations under the policy."].)

Courts have widely recognized that strict enforcement of a notice provision permits the insurer "to reap the benefits flowing from the forfeiture of the insurance policy" despite a lack of prejudice. (*Alcazar v. Hayes* (Tenn. 1998) 982 S.W.2d 845, 852.) In addition to this unfair windfall, the inequitable forfeiture has consequences that fall not only on the insured but also on the general public. Indeed, we have recognized that "[t]he field of insurance so greatly affects the public interest that the industry is viewed as a 'quasi-public' business, in which the special relationship between the insurers and policyholders requires special considerations." (*Egan*, *supra*, 24 Cal.3d at p. 820; see also *Glickman v. New York Life Ins. Co.* (1940) 16 Cal.2d 626, 635 ["The object and purpose of insurance is to indemnify the policyholder in case of loss, and ordinarily such indemnity should be effectuated rather than defeated. To that end the law makes every rational intendment in order to give full protection to the interests of the policyholder."].) Where an insured fulfills its primary duty under the parties' bargain, failure to give timely notice will not excuse the insurer's reciprocal obligations unless the insurer demonstrates prejudice from the failure. (See, e.g., *Campbell*, *supra*, 60 Cal.2d at pp. 305-307.)

Much the same rationale applies to first party policy provisions requiring the insurer's consent before the policyholder incurs costs. Indian Harbor itself has suggested that a consent provision guards against the insured making unnecessary expenditures, allows the insurer to approve and control costs, and protects the insurer's subrogation rights. In

the case of a pollution remediation policy, a consent requirement also avoids the potential destruction of evidence, through the insured's unilateral remediation efforts, that could permit the insurer to make more fully informed decisions about whether to approve certain expenses. Yet at core, these purposes are much the same as those pertaining to notice provisions. They all facilitate the insurer's primary duties under the contract and speak to minimizing prejudice in performing those duties. For these reasons, the notice-prejudice rule makes good sense for consent provisions in first party policies just as it does for notice provisions.

We have no reason to believe imposing this rule on first party insurers will prove so unmanageable for those suffering actual prejudice to justify a contrary conclusion. (See *Campbell*, *supra*, 60 Cal.2d at p. 307.) Requiring the first party insurers to show prejudice because the insured's actions meaningfully increased remediation costs or significantly hampered insurers' abilities to seek subrogation against responsible parties adequately protects their interests while furthering the broader public policy considerations we have already discussed.

Whereas first party coverage obligates the insurer to pay damages claimed by the insured itself, third party coverage obligates the insurer to defend, settle, and pay damages claimed by a third party against the insured. "[A] first party insurance policy provides coverage for loss or damage sustained directly by the insured (e.g., life, disability, health, fire, theft and casualty insurance). A third party liability policy, by contrast, provides coverage for liability of the insured to a third party who has been injured because of the insured's negligence. Examples of such coverage are typically found in (but not limited to) commercial general liability policies, a homeowner's liability policy, a

directors and officers liability policy, or an errors and omissions policy. In the usual first party policy context, the insurer promises to pay money to the insured upon the happening of an event (also known as an occurrence), the risk of which has been insured against. In the typical third party liability policy context, the carrier assumes a contractual duty to pay judgments the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by the insured." (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 663 (*Montrose*).) Thus, in the first party context, the insured looks to the insurer to cover an insured event or occurrence. (*Id.* at p. 664.) The insured must not ignore the damage once it is discovered, or otherwise prejudice the insurer's ability to investigate and cover the loss. In the third party liability context, "the insurer is invested with the complete control and direction of the defense." (*Truck Ins. Exchange v. Unigard Ins. Co.* (2000) 79 Cal.App.4th 966, 981.) In third party cases, "the decision to pay any remediation costs outside the civil action context raises a judgment call left solely to the insurer." (*Jamestown Builders Inc. v. General Star Indemnity Co.* (1999) 77 Cal.App.4th 341, 346 (*Jamestown Builders*).)

In third-party insurance policies, then, consent provisions, sometimes called "no voluntary payment" provisions, "are designed to ensure that responsible insurers that promptly accept a defense tendered by their insureds thereby gain control over the defense and settlement of the claim." (*Jamestown Builders, supra,* 77 Cal.App.4th at p. 346.) *Jamestown Builders* explained that these consent clauses mean that "insureds cannot unilaterally settle a claim before the establishment of the claim against them and the insurer's refusal to defend in a lawsuit to establish liability. . . . In short, the provision protects

against coverage by fait accompli." (*Ibid.*) The insurer's duties to defend and settle a lawsuit are crucial to its coverage obligations. (*Helfand v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 869, 888; see *Pacific Employers Ins. Co. v. Superior Court* [insurer left without control of its insured's defense or settlement under a claims-made policy has been inherently prejudiced by the lack of timely notice].) Because the insurer's right to control the defense and settlement of claims is paramount in the third-party context, California appellate courts have generally refused to find the notice-prejudice rule applicable to consent provisions in third-party policies. (See *Insua v. Scottsdale Inc. Co.* (2002) 104 Cal.App.4th 737, 745; *Jamestown Builders*, at p. 346 [notice-prejudice rule does not apply to consent provisions].)

No California court has addressed whether the notice-prejudice rule should be extended to a consent provision in the context of first party coverage. In a true first party context, there is no claim of liability for the insurer to defend and hence no logical need for it to retain unimpaired control over the claims handling. Thus, the reasons courts have refused to apply the notice-prejudice rule to consent provisions in third party policies generally do not apply to first party coverage. Primarily, in a first party policy, the insurer's duty to defend and settle potential claims is not crucial to its coverage obligations. Compared with third party coverage, the insurer simply does not exercise the same contractual control over the potential loss or occurrence, which can happen long after the policy period has expired. (*Montrose, supra,* 10 Cal.4th at p. 663.)

For these reasons, failure to obtain consent in the first party context is not inherently prejudicial, and the usual logic of the notice-prejudice rule should control, in the absence of a

coverage requirement for a third party claim or potential claim. Where the insurer owes no duty to defend against third party claims, the insured's failure to seek the insurer's consent to remediate a loss implicates risks that, while perhaps different in degree, are not so dissimilar to those in failing to provide notice of a loss to warrant departure from a case-by-case analysis of prejudice. For these reasons, we hold that California's notice-prejudice rule is applicable to a consent provision in a first party policy where coverage does not depend on the existence of a third party claim or potential claim.

Yet ultimately this case is not one where we can offer a definitive ruling on whether the notice-prejudice rule applies to the Policy's consent provision because the parties vigorously dispute whether Indian Harbor's policy provides first party or third party coverage. The Policy's insuring provisions are written in two parts: Section I.B. of the Policy describes the Insuring Agreement with respect to remediation liability, reads as follows: "The Company will pay on behalf of the INSURED for REMEDIATION EXPENSE and related LEGAL EXPENSE resulting from any POLLUTION CONDITION on, at, under or migrating from any COVERED LOCATION:

> "1. for a CLAIM first made against the INSURED during the POLICY PERIOD which the insured has or will become legally obligated to pay; *or*

> "2. that is first discovered during the POLICY PERIOD, provided that the INSURED reports such CLAIM or POLLUTION CONDITION to the Company, in writing, during the POLICY PERIOD or, where applicable, the EXTENDED REPORTING PERIOD." (Italics added.)

Pitzer argues that section 1.B.2 provides first party liability coverage. Pitzer points out that the insurer in part 1.B.2 is arguably promising to pay money to the insured upon the happening of an event that the insured itself discovers—and the typical claims-made third party policy does not have a "discovery requirement as a prerequisite of triggering coverage." (*Montrose, supra*, 10 Cal.4th at p. 664.) Indian Harbor asserts, to the contrary, that sections 1.B.1 and 1.B.2 do not provide coverage for true first party remediation, in part because the policy defines "Remediation Expense" as an expense incurred to abate a pollution condition "to the extent required by" federal, state, or local laws or by "a legally executed state voluntary program" for cleaning up a pollution condition.

Resolving the question whether the Policy's coverage should be considered first party or third party for purposes of the notice-prejudice rule is beyond the scope of the Ninth Circuit's question to us. (As originally framed, the federal court's question was only whether "a consent provision in a first-party claim insurance policy [can] be interpreted as a notice provision such that the notice-prejudice rule applies.") Without additional evidence regarding the intent of the parties in forming the Policy, we leave it to the Ninth Circuit to determine what type of policy is at issue, and the ultimate question of whether the notice-prejudice rule applies to the consent provision here.

### III. CONCLUSION

Based on the foregoing reasoning, we conclude that the notice-prejudice rule is a fundamental public policy of our state and that it applies to consent provisions in first party insurance policies. Because the parties dispute the type of policy at issue

here, we leave construction of the insurance contract to the Ninth Circuit. That construction will determine whether the notice-prejudice rule applies to the Policy's consent provision.

**CHIN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Pitzer College v. Indian Harbor Insurance Company

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX on request pursuant to rule 8.548, Cal. Rules of Court
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S239510
**Date Filed:** August 29, 2019

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Murtaugh Meyer Nelson & Treglia, Murtaugh Treglia Stern & Deily, Michael J. Murtaugh, Lawrence J. DiPinto and Thomas N. Fay for Plaintiff and Appellant.

Polsinelli, Richard C. Giller and Michelle Buckley for United Policyholders as Amicus Curiae on behalf of Plaintiff and Appellant.

Duane Morris, Max H. Stern, Jessica E. La Londe and Katherine Nichols for Defendant and Respondent.

Crowell & Moring, Laura A. Foggan and Michael Lee Huggins for Complex Insurance Claims Litigation Association and American Insurance Association as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Thomas N. Fay
Murtaugh Treglia Stern & Deily
2603 Main Street, Penthouse
Irvine, CA  92614-6232
(949) 794-4000

Max H. Stern
Duane Morris
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105-1127
(415) 957-3000